Filed 8/18/16  In re Olivia S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re OLIVIA S., a Person Coming Under the Juvenile Court Law. | |
| | D069737 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3849B) |
| v. | |
| MICHELLE H., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, Danielle Davidian and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Michelle H. contends that the juvenile court erred by failing to apply the beneficial parent/child relationship exception to termination of parental rights to her daughter, Olivia S., under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) (beneficial relationship exception).[1]  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Michelle H. is the mother of Olivia S., who was born in July 2013, and Sawyer H., who is now 18 years old.[2]  Olivia's father passed away when she was six months old.

In November 2014, the San Diego County Health and Human Services Agency (Agency) detained Olivia in protective custody, alleging that Olivia had suffered, or was at substantial risk of suffering, serious physical harm or illness due to Michelle's mental illness.  (§ 300, subd. (b).)  The Agency alleged that Michelle was paranoid and delusional, and that her mental health condition had severely deteriorated during the past year.  Olivia, who was 16 months old, was not meeting developmental milestones.  She had a flat affect and did not interact with her surroundings or with people.  Michelle believed her children were being stalked and kept them socially isolated.  The Agency stated that if Olivia were left in her mother's care, the deprivation of stimulation, social contact and education would seriously damage Olivia's physical and emotional health.

Michelle was hospitalized for three weeks after the detention hearing.  Doctors diagnosed her condition as paranoid schizophrenia and prescribed an antipsychotic

---

[1]     Further unspecified statutory references are to the Welfare and Institutions Code.

[2]     Olivia's half brother, Sawyer H., is not a subject of this appeal.

medication for her. The juvenile court ordered Michelle to undergo two psychological evaluations.

Francesca Lehman, Psy.D., diagnosed Michelle's mental health condition as delusional disorder, persecutory type, continuous, and anxiety disorder not otherwise specified (NOS). Lehman concluded that Michelle suffered from "a severe mental disorder which will impact her ability to parent adequately" and that Michelle's "prognosis is poor given the severity and chronicity of the psychotic disorder, combined with a persistent lack of insight and resistance on the part of [Michelle]."

Walter J. Litwin, Ph.D., diagnosed Michelle's mental health condition as posttraumatic stress disorder, psychotic disorder NOS, rule out delusional disorder, persecutory type, and paranoid personality disorder. Dr. Litwin stated that there was "a much less than likely probability that [Michelle] can make enough progress to effectively parent within the [] time limits set for this case."

In its status review report for the six-month hearing, the Agency reported that Olivia, who was in foster care, was becoming more demonstrative and more verbal. Olivia was very shy with strangers but was willing to explore her surroundings in the company of a trusted adult. She was comfortable in her caregivers' home.

Michelle visited Olivia every week for an hour and a half to two hours. Visitation was monitored. Olivia was happy to see her mother. Michelle tried to arrange activities that interested Olivia. Their visits appeared to be positive for Olivia. When the visits ended, Olivia did not show signs of anxiety, distress or other emotional reaction.

Michelle participated regularly in her case plan. However, there was little to no change in her mental health condition. She continued to believe that her life and her children's lives were in danger from an "unknown conspiracy." According to Michelle's therapist, Michelle consistently attended and engaged in therapy but had fixed delusions that were unchanged and impacted her ability to function. At the six-month review hearing, at the Agency's recommendation, the juvenile court terminated reunification services and set a section 366.26 hearing.

In its report to the court for the section 366.26 hearing, dated December 10, 2015, the Agency reported that Olivia was generally and specifically adoptable. Olivia's caregivers wanted to adopt her. Although Olivia was initially assessed with delays in communication, social and emotional development, gross and fine motor skills, and problem solving, Olivia's most recent developmental screening showed that her overall language skills were in the low average range and that she tested in the high average range for fine motor skills. The evaluator recommended that Olivia continue with speech therapy and early intervention services.

Olivia was very shy. She would cry when she first met strangers, including new social workers, and would cling to her caregivers or hide behind them. Olivia was affectionate with her caregivers.

After the case was referred to a section 366.26 hearing, an adoptions social worker was assigned to the case. Michelle told the new social worker that the Agency had traumatized Olivia by removing her from her home and that the Agency had disrupted her bond with her daughter. At the first visits that she observed, the social worker noted that

4

Olivia went easily to Michelle. Michelle intervened when the social worker offered a lollipop to Olivia, explaining that she did not want her daughter to have sugar.

The social worker observed a visit between Olivia and Michelle on January 15, 2016. Michelle engaged Olivia with toys. Michelle asked Olivia, "Do you want money? and began counting bills. She asked, "How much do you want? Five? Ten? Twenty?" Two-year old Olivia replied, "Twenty."

Michelle asked the social worker whether it was normal for Olivia to repeat everything that Michelle said. The social worker explained that Olivia's repetition was normal and was part of the process of learning language. At the end of the visit, Michelle strapped Olivia in her car seat. Michelle told the social worker that Olivia had whispered "I love you" to her for the first time.

The social worker observed another visit on January 29. Michelle was waiting for Olivia when she arrived. Olivia did not walk toward her mother. The visitation monitor directed Olivia to go to her mother. Olivia walked over and stood next to her mother, but did not display any signs of affection. Michelle put $36 in Olivia's bag for the caregiver to use for Olivia. When the visit ended, Michelle put her keys to her gym locker on a string and put them around Olivia's neck, telling Olivia that she was giving her the "keys to my heart." The visitation monitor said that the keys were dirty and were not an appropriate gift for Olivia. Michelle was upset about removing the keys from Olivia's neck and felt that removing them would have a lasting impact on Olivia's emotional health.

The social worker reported that Michelle's visits with Olivia were generally consistent. Olivia enjoyed visiting with Michelle but did not show some of the key signs of healthy attachment, such as joy or excitement upon seeing her mother, displaying a preference for her, or seeking comfort, praise and affection from her. In addition, Olivia's affect was often flat during visits. Although Olivia was not generally emotionally expressive, the social worker observed that Olivia had more of an emotional connection and attachment with her caregivers than she did with her mother. During visits, Olivia typically focused on playing with toys. Michelle tried to engage Olivia by asking her questions, but Olivia frequently ignored them. Michelle's questions were often developmentally inappropriate for Olivia.

The section 366.26 hearing was held on February 4, 2016. The Agency's reports were admitted into evidence. Michelle did not cross-examine the social worker.

Michelle testified that before Olivia was removed from her care, she took care of all of Olivia's daily needs. They had a mother/daughter bond. Olivia was 16 months old when she was removed from Michelle's care. Michelle was still breastfeeding Olivia at the time of removal. After Olivia's removal, the Agency provided one visit each week for an hour and a half. Olivia was happy to see Michelle. Approximately every other visit, Olivia would say, "I want to go with mom." Olivia was affectionate with Michelle. She hugged and kissed her and told her that she loved her. When the visits ended, Olivia was distressed.

Michelle said that an hour and a half of visitation per week was not sufficient to allow her to maintain her close bond with her daughter. Michelle asked for additional

visits but the Agency refused to increase visitation. Nevertheless, Michelle believed that Olivia still shared a strong bond with her because she had carried Olivia throughout pregnancy, breastfed her, met her daily needs and assumed full responsibility for her. Michelle said that she loved Olivia and that she was a capable mother.

Without comment, the juvenile court found that the beneficial relationship exception did not apply. The juvenile court determined that Olivia was adoptable, terminated parental rights, and designated Olivia's caregivers as her prospective adoptive parents.

DISCUSSION

A

*Contentions on Appeal*

Michelle contends that she demonstrated that Olivia had a beneficial relationship with her and that the juvenile court therefore erred when it terminated her parental rights. She argues that in determining the nature of the parent/child bond, the juvenile court should have taken into consideration the Agency's limitations on her visitation with Olivia, but that the court failed to do so. Michelle asserts that the social worker's conclusions about the quality of the parent/child relationship are belied by his descriptions of the many positive interactions that she and Olivia shared during visits. Michelle argues that the juvenile court erred by not properly considering the factors that determine whether the beneficial relationship exception applies.

The Agency responds that the juvenile court properly found that the beneficial relationship exception did not apply. The Agency acknowledges that Michelle

7

maintained consistent and regular visitation with Olivia, but argues that Michelle did not occupy a parental role in Olivia's life and that Michelle did not prove that the benefits of continuing the parent/child relationship outweighed the well-being that Olivia would gain in a permanent home with new, adoptive parents.

B

*Legal Principles and Standard of Review*

At a section 366.26 permanency planning hearing, the court may order one of three alternatives—adoption, guardianship or long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297.) If a child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*Id.* at p. 297; *San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888.) If the court determines that a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

An exception to termination of parental rights applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) " '[B]enefit from continuing the . . . relationship' " means that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "If severing the natural parent/child relationship would deprive

8

the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

C

*Analysis*

Michelle argues that by not increasing visitation, the Agency set the course for termination of parental rights. Michelle contends that she was prejudiced by the lack of visitation because she was not able to demonstrate the full strength of her bond with her daughter. This is a reasonable services argument that Michelle might have raised, but did not, in a writ proceeding under California Rules of Court, rule 8.452. "In order to obtain review on appeal from a final order in a section 366.26 hearing of issues subsumed within an order setting the section 366.26 hearing, the parent first must timely file a writ petition." (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 755-756.) Thus, Michelle has forfeited this argument on appeal.

Even if the issue were not forfeited on appeal, we would not be persuaded by Michelle's argument that the Agency's failure to increase visitation eroded Olivia's beneficial bond with her. The record shows that although Michelle has strengths as a parent, those strengths were greatly undermined by Michelle's belief that she had to

9

socially isolate Olivia in order to protect her. As a result of this isolation, Olivia's development lagged in many areas. At 16 months, Olivia did not interact with her surroundings or with people. Prior to removal, a social worker observed Olivia standing without moving for at least 27 minutes. When the social worker pointed out Olivia's behavior to Michelle, Michelle picked up Olivia. Olivia did not play, smile, or interact with Michelle or the social worker. Her facial expression remained unchanged. Thus, at what Michelle contends is the height of Olivia's bonding with her, the record supports the reasonable inference that Michelle's parenting was detrimental to Olivia and placed her at substantial risk of harm.

We are also not persuaded by the argument that Olivia's many positive interactions with Michelle belied the social worker's conclusion that Olivia did not have a beneficial relationship with Michelle. "Evidence of 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.) The social worker reported that Olivia enjoyed visiting Michelle. However, Olivia did not exhibit key signs of healthy attachment. She did not appear excited to see her mother or display a preference for her when other adults were present. Olivia did not seek comfort, praise and affection from Michelle. Based upon his observations of Olivia's interactions with her mother and caregivers, the social worker believed that Olivia had more of an emotional connection and attachment with her caregivers than she did with her mother.

In addition, in order to justify application of the beneficial relationship exception to termination of parental rights, any relationship between parent and child must be

10

sufficiently significant that the child would suffer detriment from its termination. (*In re Melvin A.* (2000) 82 Cal.App.4th at 1243, 1253.) Michelle did not show that Olivia would suffer detriment from termination of parental rights. Indifference to a parent or detachment indicate the lack of a necessary positive relationship. (*In re Amanda D.* (1997) 55 Cal.App.4th 813, 822.) In addition, Michelle struggled to understand the protective issues in the case and insisted that there was a conspiracy to harm her and her children. Despite fully participating in services, Michelle did not understand Olivia's age-appropriate behaviors.

By the time of the section 366.26 hearing, Olivia had been with her caregivers for more than 14 months. The record shows that Olivia had an emotional connection and attachment with her caregivers, and sought them out for comfort. In their care, Olivia developed from a withdrawn child who did not interact with her surroundings or with other people to a social young girl who enjoyed playing outside, walking the family dog, drawing and coloring, and playing with puzzles, balls and stuffed animals. While Olivia was not spontaneously affectionate with her mother, she hugged her caregivers and cuddled with them. Thus, the juvenile court could reasonably determine that Olivia would greatly benefit from the security of a stable, permanent home with committed, capable adoptive parents, and that termination of parental rights would not be detrimental to her. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Finally, we reject the argument that the juvenile court did not properly consider the relevant factors in determining whether the beneficial relationship exception applies. Those factors include the child's age, the portion of the child's life spent in the parent's

11

custody, the positive or negative effects of interaction between parent and child, and the child's particular needs. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) However, these are just "some of the variables which logically affect a parent/child bond." (*Ibid*.) The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. (*Id*. at p. 575.) The evidence before the juvenile court at the time of the section 366.26 hearing clearly showed that although Michelle met Olivia's needs for physical care and nourishment, she did not provide comfort, affection and stimulation to Olivia either before or after Olivia's removal from her custody. The social worker did not believe that Olivia had a significant attachment to her mother. Thus, the juvenile court did not abuse its discretion when it determined that the parent/child relationship did not promote Olivia's well-being to such a degree as to outweigh the benefit that she would gain from the security of adoption. (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575.)

DISPOSITION

The order terminating parental rights is affirmed.


_____

AARON, J.

WE CONCUR:


_____

HALLER, Acting P. J.


_____

McDONALD, J.