Filed 2/9/21  In re L.H. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|   |   |
|---|---|
| In re L.H., Person Coming Under the Juvenile Court Law. | D077838 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. A.H., Defendant and Appellant. | (Super. Ct. No. EJ004279) |

APPEAL from orders of the Superior Court of San Diego County, Rohanee Zapanta, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Dana C. Schoffner, Deputy County Counsel, for Plaintiff and Respondent.

A.H. (Father) appeals from the juvenile court's orders denying his Welfare and Institutions Code[1] section 388 modification petition and terminating parental rights as to his daughter L.H. (§ 366.26.) He contends the juvenile court abused its discretion by denying his section 388 motion because he had shown a sufficient change of circumstances and the request was in L.H.'s best interest. He also claims the juvenile court erred in freeing L.H. for adoption because her bond with him outweighed the benefits of adoption. We affirm the orders.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Father started smoking methamphetamine on a daily basis when he was 19 years old. B.H.-G. (Mother) also smoked methamphetamine and suffered from untreated schizophrenia.[2] Mother gave birth to L.H. in late January 2018. On April 19, 2018, the San Diego County Health and Human Services Agency (Agency) received a child welfare referral concerning L.H. after Mother tried to fight law enforcement officers while holding L.H. Father, who worked full-time, arrived during the incident.

During the investigation, a psychologist who met with Mother feared for L.H.'s safety if left alone with Mother believing that Mother might harm or neglect the infant. In May 2018, the Agency filed a petition on behalf of L.H., pursuant to section 300, subdivision (b) due to Mother's inability to provide regular care and supervision for the child due to her untreated mental illness and violent behavior and Father's failure to supervise and protect L.H. The juvenile court issued a protective custody warrant and

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother is not a party to this appeal.

2

detained L.H. in a licensed foster home. At the detention hearing the court appointed counsel for the parents, a guardian ad litem for Mother and L.H., and made a prima facie finding on the petition.

In July 2018, the Agency filed an amended petition alleging Father failed to protect L.H. under section 300, subdivision (b). At the contested jurisdictional and dispositional hearing later that month, the court made true findings on both counts and noted that the parents had made minimal progress toward mitigating the causes necessitating placement. In October 2018, the court placed L.H. with maternal great aunt J.J., as a confidential non-relative extended family member to Father, where she remained throughout the case. A status review report dated January 2019 stated that the parents had made minimal to no progress in the services outlined by their case plan.

At the contested six-month review hearing in March 2019, the court continued reunification services for both parents. In June 2019, the court terminated Mother's reunification services. In July 2019, the court granted Father reunification services to the 18-month date. At the contested 18-month review hearing in February 2020, the court granted the Agency's section 388 motion seeking to return Father to supervised visitation based on his continuing struggle to remain sober. The court also terminated Father's reunification services and set the matter for a section 366.26 hearing.

Father filed a section 388 petition to place L.H. with him or expand visitation. The court made a prima facie finding on the petition and set an evidentiary hearing to coincide with the contested section 366.26 hearing.

At the contested section 366.26 hearing in August 2020, the court denied Father's section 388 petition concluding that Father failed to demonstrate changed circumstances or that placing L.H. with him would

serve L.H.'s best interest. As to the contested section 366.26 issues, the juvenile court found Father visited L.H. consistently, but determined that he did not fulfill a parental role for L.H. The court terminated the parents' parental rights, selected adoption as L.H.'s permanent plan and designated L.H.'s current caregiver as the prospective adoptive parent. Father timely appealed.

## II.

## DISCUSSION

### A. *No Error in Denial of Modification Petition*

#### 1. Relevant law and standard of review

"Section 388 provides an ' "escape mechanism" ' for parents facing termination of their parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated. [Citation.] This procedural mechanism, viewed in the context of the dependency scheme as a whole, provides the parent due process while accommodating the child's right to stability and permanency. [Citation.] After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests. [Citation.] Section 388 allows a parent to rebut that presumption by demonstrating changed circumstances that would warrant modification of a prior court order." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)

"[A] section 388 petition seeking reinstatement of reunification services or return of the child will necessarily involve a parent who has made mistakes sufficient to support termination of services at some point in the past. The question must be whether the changes the parent made since then are substantial enough to overshadow that prior determination, such that reunification is now in the child's best interests." (*In re J.M.* (2020) 50

4

Cal.App.5th 833, 848.) "A parent establishes a substantial change of circumstances for purposes of section 388 by showing that, during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*In re J.M.*, at p. 846.)

At a hearing on a section 388 petition seeking to change a child's placement, the moving party must show a change of circumstances or new evidence and that a change in placement is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) A modification petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*Id.* at p. 318.) A proper exercise of discretion is " 'not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles . . . to be exercised in conformity with the spirit of the law[,] and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1066.) Exercises of discretion must be " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' " (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15.)

2. Analysis

The juvenile court noted that throughout the case Father "has been working" on his sobriety and found that Father still required "a lot of work [on his sobriety]." The court also commented that because Father's focus has been on his sobriety, this took "away from his ability to really begin the process of understanding his daughter," his ability to "hone the tools and the skills" necessary to parent, and provide evidence showing that he not only

could provide stability to L.H., but that he had "the tools necessary to eliminate and alleviate the safety concerns as [they] relate[] to" L.H.

Accordingly, the juvenile court denied Father's 388 petition to place L.H. with him, finding there was not "a strong enough change in circumstances that would support placement with [Father], and that placement [with Father] would be in [L.H.'s] best interest . . . ."

Father complains that the juvenile court failed to acknowledge his "great change in circumstances" and submits the court erred because it "changed from needing evidence of sobriety to needing more work—it never states how much evidence it needs. What more could Father have done?" Father submits the evidence shows he was not merely "attempting" change, rather, he was actualizing change.

In the months before the section 366.26 hearing, we agree that Father was actualizing change. In March 2020, he obtained full-time employment and claimed that he earned enough to support himself and L.H. About two weeks before the hearing, Father obtained his own one-bedroom apartment with space for L.H. and was amenable to having the social worker inspect his new residence. Father had also been sober for nine months, however, four of those months were during his in-patient drug program and the following months Father resided at a sober living facility. Accordingly, at the time of the hearing, Father had been living on his own for only two weeks.

Balancing these facts is Father's history. Father used methamphetamine on a daily basis for eight years. On his own, Father's longest period of sobriety was three months. Father claimed that he and Mother stopped using drugs when Mother learned about her pregnancy at about five months, but admitted that he resumed his drug use "a couple weeks" after L.H.'s birth.

6

Shortly after L.H.'s removal, Father tested positive for methamphetamine even though he told a social worker about a week earlier that he had "quit" and started a treatment program. He again tested positive for methamphetamine the following month. Father admitted using in October 2018 and informed a social worker in November 2018 that he had relapsed. A status review report dated January 2019 stated that Father had "spotty attendance" at his drug treatment program and had several relapses on methamphetamine throughout the review period.

Although Father successfully completed a three month in-patient drug treatment program on April 7, 2019, he again tested positive for methamphetamine on September 25, 2019 and admitted to the social worker that he had been using. It was not until Father entered and completed a four month in-patient drug treatment program that he consistently tested negative for methamphetamine. Accordingly, after L.H.'s removal in June 2018, Father bounced between supervised and unsupervised visitation based on his ability to maintain his sobriety.

Eighteen months elapsed from the filing of the dependency petition until Father was able to maintain his sobriety. Early in these proceedings, Father was advised that the court may limit him to six months to participate in and make substantial progress in court ordered services and, if this failed to occur, his parental right could be terminated. Thereafter, social workers *repeatedly* informed Father of the time period he had to reunify with L.H. and his need to make significant progress to avoid the termination of his parental rights. Despite knowing about the short time period to reunify with L.H., Father's sobriety did not occur until his second stint in the highly structured setting of a residential treatment program and subsequent sober living environment.

As the social worker noted, "substance abuse treatment is a life-long journey, not often complete after a period of sobriety." Given the length of Father's drug use and his history of relapse over the 27 months of the dependency proceeding, the juvenile court was understandably wary about the permanence of Father's most recent period of sobriety. Although Father made great strides in his recovery in the months before the order denying his section 388 petition, the juvenile court's conclusion that Father's circumstances were still changing was reasonable.

Even if there were a change in circumstances, however, Father has not established the juvenile court erred by finding that placing L.H. with him or expanding visitation were not in L.H.'s best interests. The factors to be considered in evaluating the child's best interests under section 388 are "the seriousness of the reason for the dependency and the reason the problem was not overcome; the relative strength of the parent-child and child-caretaker bonds and the length of time the child has been in the system; and the nature of the change in circumstances, the ease by which the change could be achieved, and the reason the change was not made sooner." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446-447.) Where, as here, the juvenile court has terminated services, the best interest analysis is focused on the child's need for permanency and stability. (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) The child's best interests "are not to further delay permanency and stability in favor of rewarding" the parent for his or her "hard work and efforts to reunify." (*Ibid.*)

The evidence before the juvenile court supported its findings under these factors. The problems that led to this dependency were severe, including Mother's untreated mental illness and Father's significant substance abuse. As late as 11 months into the dependency proceeding,

Father attempted to hide his drug use by appearing at a testing site with a shaved head and fingernails cut too short for testing. Father's efforts in ameliorating his substance abuse did not begin in earnest until November 2020, 30 months into the dependency proceeding, when he started his second in-patient drug treatment program. Father's history of relapse reflects the difficultly he had achieving his sobriety.

In the meantime, L.H. has been thriving in her caregiver's home for 21 months. L.H. is bonded to her caregiver who attends to her daily needs and wishes to adopt her. Although Father's visits with L.H. are appropriate and she refers to him as "daddy," the social worker noted that the caregiver refers to Father as "daddy" when talking with L.H., which teaches L.H. to use this term. Notably, outside of visitation, Father does not check-in with L.H.'s caregiver to inquire about her daily life. During visitation, Father did not bring anything to engage L.H. and relied on the caregiver to bring age-appropriate supplies and food items. Ultimately, the social worker opined that Father's relationship with L.H. was not parental in nature.

We reject Father's argument that he met all goals of his case plan by the time he filed his section 388 motion. Father's service objectives included ensuring that L.H. attends all medical appointments, staying up to date with her medical needs, knowing age-appropriate behaviors, and researching activities to do with L.H. during visits that will help her meet developmental milestones. Father has not cited anything in the record showing that he satisfied these service objectives and our review of the record has not uncovered such evidence.

The juvenile court's order denying Father's section 388 petition did not "exceed[] the bounds of reason" in the particular circumstances of this case.

9

(*Stephanie M., supra*, 7 Cal.4th at pp. 318-319.) Hence, the juvenile court did not abuse its discretion denying the petition. (See *Ibid.*)

B. *Substantial Evidence Supports The Finding That The Beneficial Parent-Child Relationship Exception Did Not Apply*

1. Relevant law and standard of review

The permanency planning hearing aims "to end the uncertainty of foster care and allow the dependent child to form a long-lasting emotional attachment to a permanent caretaker." (*In re Emily L.* (1989) 212 Cal.App.3d 734, 742.) The Legislature prefers adoption where possible. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) Once the juvenile court finds a child is adoptable, the parent bears the burden of proving one of the exceptions to terminating parental rights exists. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

One of the exceptions to the preference for adoption is the beneficial parent-child relationship exception, which exists where a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The existence of this relationship is determined by taking into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of

10

whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)[3]

2. Analysis

The juvenile court found, and the parties did not dispute, that Father engaged in consistent visitation with L.H. The regularity of Father's visits, however, is not dispositive. The juvenile court determined that Father's relationship with L.H. did not rise to the level of a parental role. Father challenges this factual finding as a ground for reversal. We conclude that substantial evidence supports the finding in this case.

By the time of the section 366.26 hearing on August 14, 2020, L.H. had spent approximately 27 months out of Father's care and custody, Father remained at weekly supervised visitation for approximately one hour and had never had overnight visits. For 22 months of this time, L.H.'s caregiver, her maternal great aunt, provided for her daily needs and expressed a strong desire to adopt her. The caregiver's husband and two children support the adoption. L.H. has "thrived" under the caregiver who has provided L.H. "with a lot of love" and addressed all of L.H.'s "medical and developmental appointments and needs."

---

[3]    Father asserts that the substantial evidence standard of review applies to the court's decision to not apply the beneficial parent-child relationship exception. (See, e.g., *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) The question of what standard of appellate review applies to this exception is currently pending before our Supreme Court. (*In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.) Even if we had solely applied the substantial evidence standard of review, we would still conclude the juvenile court did not err in declining to apply the beneficial parent-child relationship exception in the circumstances of this case.

" '[F]or the [beneficial parent-child relationship] exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative. . . .' " (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.) During supervised visits with Father, L.H. sought the caregiver for comfort, food, and to express when she was ready to go home. Although L.H. referred to Father as " 'daddy' " and exhibited excitement for visits, she consistently returned to her routine after visits with Father without distress. Ultimately, the social worker opined that L.H.'s and Father's relationship was not parental in nature. The juvenile court was entitled to credit the assessments and conclusions of the social workers. (*In re Casey D.* (1999) 70 Cal App.4th 38, 53.)

In summary, our review of the record shows substantial evidence upon which the juvenile court could reasonably rely to conclude that Father's relationship with L.H. did not rise to the level of a "parental role." Where the juvenile court concludes that the nature of the relationship between a parent and child does not qualitatively resemble that of a "parental role," the statutory exception to termination of parental rights does not apply, and there is no occasion for the juvenile court to weigh the benefits of continuing such a relationship against the benefits of the legislative preference for adoption. Since the juvenile court's finding in this case is supported by substantial evidence, we find no abuse of discretion in the juvenile court's order terminating Father's parental rights.[4]

---

4      Father also contends that a guardianship would have provided permanency for L.H. while maintaining her significant relationship with him. This argument ignores that the juvenile court is subject to the mandatory statutory preference for adoption over legal guardianship. (§ 366.26, subd. (b)(1).) "In decreeing adoption to be the preferred permanent plan, the

12

DISPOSITION

The orders are affirmed.


IRION, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.

---

Legislature recognized that, 'Although guardianship may be a more stable solution than foster care, it is not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature.' " (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)  We conclude that the juvenile court did not abuse its discretion by rejecting legal guardianship in favor of the permanence of adoption.