Filed 9/11/24  In re G.H. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.H. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E082683 |
| Plaintiff and Respondent, | (Super. Ct. No. INJ2100027) |
| v. | OPINION |
| A.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Elizabeth Tucker, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Sean A. Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham, and Catherine E. Rupp, Deputy County Counsel, for Plaintiff and Respondent.

1

I.

INTRODUCTION

Defendant and appellant, A.B. (Mother) appeals the juvenile court's order terminating her parental rights to her four minor children. She argues the juvenile court erroneously denied her request to continue the hearing under Welfare and Institutions Code section 366.26,[1] during which her parental rights were terminated, and erroneously found that the beneficial parental relationship exception to adoption did not apply. We affirm.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2021, plaintiff and respondent, Riverside County Department of Public Social Services (Department) received a referral alleging general neglect and emotional abuse of Mother's four minor children, seven-year-old Ga.H., five-year-old N.H., four-year-old E.H., and 20-month-old Gi.H. Ga.H. reported he saw Father[2] hitting Mother.

A Department social worker investigating the referral interviewed the parents and children. Mother confirmed Father's recent abuse and reported that they both have a history of using methamphetamine. Mother has been in several substance abuse

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Because Father is not a party to this appeal, we need not discuss the facts and dependency proceedings concerning him.

2

programs, but none had been successful.  The social worker offered Mother drug treatment and other services, but she declined them.

In February 2021, the Department filed a section 300 petition on behalf of Ga.H., N.H., E.H., and Gi.H., alleging that the parents had engaged in domestic violence and had substance abuse issues.  After a contested detention hearing, the juvenile court ordered the children detained while ordering visitation and substance abuse and parenting services for the parents.  The children were placed in foster care.

In April 2021, the juvenile court held a contested jurisdictional hearing.  The juvenile court found that ICWA did not apply and that the Department conducted an adequate inquiry regarding whether the children may have Indian ancestry.[3]  The court also found the allegations in the petition true, adjudged the children dependents of the court, removed physical custody from the parents, and ordered family reunification services for the parents.

In a July 2021 review hearing report, the Department reported that Mother tested positive for methamphetamine in April 2021 and had missed all recent random drug tests.  At the July 2021 review hearing, the juvenile court ordered Mother to participate in a substance abuse program.  Although the Department offered her drug treatment services in March 2021, Mother had not enrolled in them.

Mother eventually enrolled in a drug treatment program on November 1, 2021, but told the social worker she would complete it by December 2, 2021.  The social worker

---

[3]  The juvenile court again found ICWA did not apply in June 2022.

3

asked Mother if the program was a 90-day program, and Mother confirmed that she could stay up to 90 days but would only stay for 30. Mother also refused to take her prescribed psychiatric medication and had trouble following the directions and rules of her drug treatment program. Her boyfriend also struggled with substance abuse. Although Mother had recently attended therapy three times, she stopped attending domestic violence courses.

For all of these reasons, the Department recommended the juvenile court terminate services for Mother. The juvenile court did so at a December 1, 2021, hearing and set a section 366.26 hearing.

In March 2022, however, Mother filed a section 388 petition requesting family reunification or family maintenance services. Mother argued her circumstances had changed because she had completed a substance abuse program and a parenting program in January 2022, she was participating in therapy, she tested negative for drugs six times since February 10, 2022, she began domestic violence classes in February, and was scheduled to complete them by April, she had resumed working, and she had a home for the children. Mother argued further services were in the children's best interests because she had addressed the issues that led to their removal, she had regularly visited them, and they would be best served by reuniting with her. Mother later filed an amended section 388 petition making the same requests but with additional supporting documentation.

The juvenile court held a hearing on Mother's section 388 petition in June 2022. After hearing argument from counsel and testimony from Mother, Father, and a

4

Department social worker, the juvenile court denied Mother's petition. The court found that, despite Mother's recent period of sobriety, her circumstances had not changed given her long history of methamphetamine use and her extensive domestic violence history with Father. The court also found that granting Mother's petition was not in the children's best interests because they were thriving and were free of the "very traumatic" environment while in parents' care.

Mother timely appealed, arguing that the juvenile court incorrectly denied her section 388 petition and erroneously found that ICWA did not apply. In July 2023, we affirmed as to Mother's section 388 petition, but vacated the juvenile court's ICWA findings and remanded for further ICWA proceedings.[4] (*In re G.H.* (July 11, 2023, E079185) [nonpub. opn.].)

Two months before that, Mother filed another section 388 petition asking the juvenile court to return the children to her care with family maintenance services or alternatively, to order reunification services. The court set a hearing on the matter for July 2023 and continued to the section 366.26 hearing for the same day.

The juvenile court continued the hearing again in July 2023, and once again in August 2023.

---

[4] On remand, the juvenile court again found that ICWA does not apply. Mother does not challenge that finding, so we need not discuss the subsequent ICWA proceedings except as they relate to Mother's request for a continuance.

The parties stipulated to a new judicial officer, Commissioner Elizabeth Tucker, who presided over a combined hearing on Mother's section 388 petition and under section 366.26 in October 2023.

Mother tried to attend the hearing by telephone, but had technical difficulties and was not on the line when the hearing began. Mother's attorney represented that Mother was "on the phone" and could not "hear anything," but the court noted she was "not in the waiting room." The court therefore took a brief recess while Mother's attorney called Mother.

When the hearing resumed, Mother's attorney asked for a continuance because Mother was in Las Vegas helping her adult daughter, who had given birth the night before. The court wanted to hear from minors' counsel, but noted that "whether [Mother's] here or not . . . I don't think that would change my indicated" ruling denying Mother's section 388 petition.

Mother's attorney then asked for a continuance on the alternative ground that new ICWA-related information had come to light earlier that morning. Mother had recently talked with her father, who relayed information about their potential Indian ancestry. Mother thus had filed an "ICWA-020" form that morning stating that she believed she had Indian ancestry through the "Haliwa Saponi" tribe in North Carolina.[5] Mother's attorney noted that the "Saponi" tribe was not federally recognized, but it was recognized

---

[5] Mother's counsel claimed at the hearing that he had filed the form that morning, but the record indicates it was filed about a week later, on October 25, 2023.

by North Carolina and "[t]here's legislation to have it federally recognized." However, counsel reported that Mother did not think "the second portion" of the "Haliwa Saponi" tribe name was "part of" the name of her family was affiliated with, meaning that she thought she was affiliated only with the "Haliwa" tribe. Mother's counsel therefore asked for a continuance "to look into this."

The Department's counsel explained that "the paperwork" Mother's counsel provided said that the potential tribe Mother was affiliated with was the "Haliwa Tribe of North Carolina," but "[w]hen you look it up, it comes up as Haliwa Saponi Indian Tribe of North Carolina," which was the only "Haliwa tribe in North Carolina." Counsel then noted that a pending federal bill, "House Bill H.R. 5236," had just been introduced to have the tribe federally recognized, but it had not been approved. Counsel argued that Mother claiming "Haliwa Saponi" heritage was "just another attempt to delay permanency."

The court found that there were no "ICWA concerns" and again found that ICWA did not apply.

Mother's attorney then argued why Mother's section 388 petition should be granted. Counsel concluded his argument by stating that if the court denied the section 388 petition, then Mother objected to terminated parental rights under "the exception to terminating rights based on the bond between mom and the children."

Minors' counsel opposed Mother's request for a continuance. Counsel argued there was no good cause to continue the matter because the parents had been aware of the

7

pending section 366.26 hearing "since March of last year" and the children needed "permanency in their forever home."

The juvenile court agreed, found there was no good cause to continue the matter, and denied Mother's request for a continuance. The court then denied Mother's section 388 petition because changing the court's orders would not be in the children's best interests.

The juvenile court then turned to the section 366.26 hearing. The court found that "the appropriate permanent plan for the children is adoption" by their current caregiver. The court therefore terminated Mother's parental rights and freed the children for adoption by their caregiver.

The court then discussed the next hearing with the parties. The Department noted that Mother "was present at the last hearing" and "was ordered to return to today's hearing." The court replied: "Let's note that for the record and also noting [M]other was aware of today's hearing and evidently did try to get on the phone. I will note it's 2:55. This Department is very very full, probably has too many cases on calendar to really give -- okay. Well, I'll stop talking on the record. I think we should note for the record that [M]other tried to be present telephonically and that father was present telephonically, I believe." The hearing concluded shortly thereafter.

Mother timely appealed.

8

III.

DISCUSSION

A. *Continuance*

"Section 352 provides that courts may 'continue any hearing' under the dependency law 'beyond the time limit within which the hearing is otherwise required to be held' (§ 352, subd. (a)(1)), provided there is 'good cause' (*id*., subd. (a)(2)) and a continuance would not be 'contrary to the interest of the minor' (*id*., subd. (a)(1)).  In evaluating the minor's interest, the court 'shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.'  (*Ibid*.)" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 632.)  We review the juvenile court's decision whether to grant a continuance for an abuse of discretion.  (*Id*. at p. 637.)

As to Mother's request for a continuance to research her potential tribal affiliation, we find no abuse of discretion.  Mother suggested in her ICWA-020 form, purportedly filed the morning of the section 366.26 hearing, that she may be affiliated with the "Haliwa Saponi" tribe of North Carolina.  But at the hearing, Mother's counsel reported that Mother thought she was affiliated only with the "Haliwa" tribe."

We sua sponte take judicial notice of House of Representatives Bill Number 5236, the proposed federal legislation the Department cited at the hearing.  (See https://www.congress.gov/bill/118th-congress/house-bill/5236.)  That legislation—which still remains only introduced and not acted on—explains that "the Haliwa Saponi Indian

9

Tribe of North Carolina" is not federally recognized and that "'Haliwa' is a geographical designation that is derived from the physical location of the Tribe, which is primarily in Halifax and Warren Counties [i.e., "Haliwa"], North Carolina." (*Id.*, § 2, subd. (2).) This legislation thus confirms that (1) "Haliwa" is not a tribe, but is instead a portmanteau of the two counties where the Saponi tribe is primarily based and (2) the Saponi tribe is not federally recognized. So even if Mother had Haliwa Saponi heritage, ICWA would not apply. (See 25 U.S.C. § 1903(8) [ICWA applies only to federally recognized tribes].) The juvenile court thus reasonably found that there was no good cause to explore further ICWA issues based on Mother's potential Haliwa Saponi heritage.

As for Mother's request for a continuance because she was helping her adult daughter, who had just given birth, we assume without deciding that this provided good cause warranting a continuance and that a continuance would not have been contrary to the children's best interests. We also assume without deciding that the juvenile court did not allow Mother to appear by phone, as Mother contends, and that this was error. Any error was harmless because it is not reasonably probable that Mother would have received a more favorable result had she appeared at the hearing. (*In re J.P.* (2017) 15 Cal.App.5th 789, 798; *In re Michael G.* (2012) 203 Cal.App.4th 580, 591.)

Mother briefly argues otherwise, nothing that she could have testified on her behalf and helped her attorney had she been granted a continuance or allowed to participate in the hearing. In her view, she could have "clarified the information about her possible tribal ancestry" and could have better discussed how to proceed with her

attorney, including by discussing a recent report she "was likely prevented from reviewing."

But, for the reasons just discussed, it is not reasonably probable that Mother's input on her tribal affiliation would have mattered since the Haliwa Saponi tribe is not federally recognized. And it is not reasonably probable that Mother's input on other issues would have mattered either. Mother argues her attendance at the hearing would have allowed her to testify and confer with her attorney on how to proceed, but she makes no attempt to explain what she would have testified about, how she would have done things differently, or why any of her input would have changed the court's findings and rulings.

In other words, Mother fails to argue, much less prove, how her attendance and input at a continued hearing was reasonably likely to have resulted in a better outcome for her. As a result, we conclude any error in denying Mother's request for a continuance was harmless.

B. *Beneficial Parental Relationship Exception*

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) The options include (1) adoption, which requires terminating parental rights, (2) guardianship, or (3) long-term foster care. (§ 366.26, subd. (c)(1), (4)(A); *In re J.C.* (2014) 226 Cal.App.4th 503, 528.) If the court finds the child is adoptable, it "'shall terminate parental rights'" and select adoption as the child's permanent plan, unless it finds that one or more

11

exceptions to the statutory adoption preference applies. (*In re K.P.*, *supra*, at p. 620; see § 366.26, subd. (c)(1)(A)-(B).) These exceptions "permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved on another ground by *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5.)

Mother argues the beneficial parental relationship exception to adoption applies here. This exception applies when "'[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Caden C.*, *supra*, 11 Cal.5th at p. 631.) For the exception to apply, the parent must prove three elements: "(1) regular *visitation and contact*, and (2) *a relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Ibid.*)

Our review of the juvenile court's ruling on whether the beneficial parental exception applies incorporates both the substantial evidence and abuse of discretion standards. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) We apply the substantial evidence standard of review to the first two prongs of the exception and the abuse of discretion standard to the third prong. (*Ibid.*)

12

Even if Mother satisfied the first two prongs, the juvenile court did not abuse its discretion in finding that she did not satisfy the third prong. "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)[6]

We first address Mother's argument that the juvenile court erred by hastily terminating her parental rights without explaining its reasoning. Mother is correct that the juvenile court's reasoning, as orally stated at the section 366.26 hearing and corresponding minute order, is thin at best. Mother is also correct that the juvenile court made no explicit findings as to the beneficial parental relationship exception, even though counsel asserted it applied. But we must assume the juvenile court implicitly made all of the necessary findings to support its orders and findings and must affirm them if they are supported by the record. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) "[W]e are aware of no requirement—and [Mother] cites no authority supporting the proposition— that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception." (*Ibid.*)

---

[6] At oral argument, Mother argued that this "greatly harmed" standard no longer applies after *Caden C.* We disagree. (See *In re G.H.* (2022) 84 Cal.App.5th 15, 25; *In re M.G.* (2022) 80 Cal.App.5th 836, 851; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1226.)

We next reject Mother's argument that the juvenile court suggested its calendar was "too crowded to properly consider" whether her parental rights should be terminated when it stated: "[M]other was aware of today's hearing and evidently did try to get on the phone. I will note it's 2:55. This Department is very very full, probably has too many cases on calendar to really give -- okay." The court made this comment after stating its ruling terminating parental rights when discussing Mother's absence at the hearing in response to the Department noting that Mother had been properly notified of the hearing long before it was held. The comment is unclear since the court did not specify what the court could not "give" due to its calendar. But we do not read it as suggesting that the court did not have the time to properly consider whether to terminate Mother's parental rights. If anything, it was suggesting that the court's heavy calendar made the court hesitant to grant Mother a continuance.

Regardless, the juvenile court expressly stated on the record that it had read and considered everything the parties had submitted before the hearing, including a court-ordered April 2023 bonding study, and the court listened to everything the parties wanted to say at the hearing. There is thus no indication that the juvenile court failed to consider anything the parties offered.

In any event, substantial evidence supports the juvenile court's implied finding that Mother had not satisfied the third prong of the beneficial parental relationship exception. By all accounts, the children are all thriving in their prospective adoptive home with no serious issues. They are bonded with their caregiver, who is committed to

14

adopting them, wants to provide them with stability, and had met all of their needs for 18 months before the section 366.26 hearing. All of the children are young, happy, healthy, and comfortable. E.H. described the caregiver as "'the best mom'" and has everything she needs in the home. When describing the household and her relationship with her caregiver, E.H. smiled, "indicating a sincere and positive connection." Gi.H. calls the caregiver "'mom'" and is affectionate and comfortable with her. N.H. felt "'good'" about being adopted and wanted to remain in the caregiver's home, where he felt "'safe.'" G.H. was sad about losing his relationship with Mother and wanted to go back to his parents' care, but felt that he would "'get over it'" and thought his life was "'pretty perfect'" in the caregiver's home. G.H. referred to his caregiver's mother as "'our grandma''" and had "a smile on his face" when describing his caregiver's household, which reflected "a sincere and positive connection."

In short, there is no indication that the children would be *greatly harmed* by terminating Mother's parental rights such that the harm "'outweigh[s] the sense of security and belonging an adoptive home would provide.'" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.) The juvenile court reasonably found (albeit implicitly) that any benefit the children would derive from a parental relationship with Mother does not "outweigh the well-being [they] would gain in a permanent home with new, adoptive parents." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The juvenile court thus did not abuse its discretion in finding that there was no "compelling reason for finding that termination [of parental rights] would be detrimental to the child[ren]. [Citations.]" (*In*

15

*re Anthony B.* (2015) 239 Cal.App.4th 389, 395.) We therefore conclude the juvenile court did not err in terminating Mother's parental rights to the children and freeing them for adoption.

Mother argues otherwise, pointing to studies showing that, in general, children are harmed when removed from their parents' care and that they benefit from a legal guardianship that keeps their parents in their lives. Mother also argues she was "the only constant" in the children's lives as they moved between caregivers, and there is no evidence that she negatively affected them in any way. Lastly, Mother emphasizes that the bonding study showed that the children were "emotionally attached" to her and they had a "strong bond" with one another.

But the issue we must decide is whether the juvenile court abused its discretion by finding that terminating Mother's parental rights would greatly harm the children. Under that deferential standard, the record supports the juvenile court's implied finding that doing so would not greatly harm the children such that it outweighed the benefits of adoption.

In reaching that conclusion, we have considered all of the evidence in the record in the light most favorable to the juvenile court's findings and orders. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 53.) Mother may have been "the only constant" in the children's lives, but she did not interact with them beyond supervised visits between January and October 2023 and nothing in the record suggests that the children wanted to visit her more. And although the bonding study is favorable to Mother in some respects,

16

it is not wholly positive for her. Mother is right that the study observed that the "children showed positive emotional attachment" to her and "they all showed multiple indications of being emotionally bonded" to her. But, at the same time, the study found that Mother "seemed somewhat overwhelmed by the four children together," although she was "more successful" with them "on an individual basis." However, Mother demonstrated a "limited ability to bond emotionally with the children, and her reported past addiction to methamphetamine has likely been the most important contributor to this." This conclusion is buttressed by Mother's statement made a couple months before the study was completed that her relationship with the children was "very strained."

On the other hand, again, there is significant evidence in the record that the children have thrived in their caregiver's home, they are strongly bonded to their caregivers, and they will benefit from being adopted by their caregivers—all of which supports the juvenile court's implied finding that Mother did not satisfy the third *Caden C.* prong. Among other things, G.H. and N.H. said they "feel good" about being adopted, N.H. and E.H. expressly stated they wanted to stay in their caregiver's home, and toddler Gi.H. considers his caregiver his "'mom.'"

Given this and the other evidence outlined above, the juvenile court did not abuse its discretion in finding that terminating parental rights would be detrimental to the children. As a result, the juvenile court properly found that the beneficial parental relationship exception to adoption did not apply and, in turn, properly terminated parental rights and freed the children for adoption.

17

IV.

DISPOSITION

The juvenile court's orders denying Mother's section 388 petition and terminating her parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON _____

J.

We concur:

McKINSTER _____

      Acting P. J.

MILLER _____

      J.